IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA

    Plaintiff,

vs.                                                  Case No. 6:23-cr-0062-KWR

MASON ANTHONY WILSON,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the Defendant's Opposed Motion for a New Trial (**Doc. 100**). Having reviewed the motions and the record, the Court finds that the Defendant's motion is not well-taken and, therefore, is **DENIED**.

## BACKGROUND

On April 14, 2022, Defendant Mason Wilson took his two-month-old daughter, B.W., to a pre-scheduled well-child checkup at her pediatrician's office in Muskogee, Oklahoma. **Doc. 102 at 12.** The pediatrician noticed a bruise on B.W.'s cheek and made a referral to the Oklahoma Department of Human Services ("DHS"). **Doc. 103 at 10.** B.W.'s mother, B.H., joined Mr. Wilson and B.W. at the pediatrician's office, and the pediatrician recommended the family go to the pediatric emergency center at St. Francis Hospital in Tulsa. *Id.*; **98 at 28;102 at 30-32.** Further examination at St. Francis Hospital revealed that B.W. sustained bruises on her face, arms, and torso; an abrasion on her neck and labia; a subconjunctival hemorrhage in her left eye; and fractures on three left side ribs, two right side ribs, left forearm, right shin bone and calf bone, and left thigh bone and calf bone. **Doc. 98 at 34-35, 38-39, 49-50, 56, 60-65.** Dr. Christine Beeson, one of B.W.'s treating physicians and the

1

Government's expert witness at trial, medically diagnosed B.W. with child physical abuse and child neglect. *Id.* **at 67-69** ("Q: What is your medical diagnosis? A: Child neglect."), **70** ("Q: Finally, Dr. Beeson, with respect to the constellation of B.W.'s injuries, her bruises, her abrasions, her eye, her ribs, her arms, her legs, what is your medical diagnosis for [B.W.]?" A: Child physical abuse confirmed."). B.W. was admitted to the hospital for treatment and observation. **Doc. 102 at 40.**

Muskogee Police Department Sergeant James Poffel and DHS child welfare specialist A.S. separately interviewed Mr. Wilson and B.H. at the hospital and photographed B.W.'s injuries. **Doc. 102 at 75; 82-83.** Mr. Wilson told A.S. that the bruise on B.W.'s cheek was caused by the infant flinging her head back and hitting her face on his shoulder a few days prior. **Doc. 102 at 85.** A few hours later, when Sergeant Poffel interviewed him, Mr. Wilson explained that the bruising occurred when B.W. fell face-first into his collarbone while burping her.[1] **Docs. 98 at 35; 103 at 29.** After learning of B.W.'s more significant injuries, B.H. and Mr. Wilson provided a new explanation for B.W.'s injuries: that B.W. had fallen off a bed. **Docs. 102 at 38-39; 103 at 29-31, 36.**

When Dr. Beeson examined B.W. the following day, B.H. told her that "B.W. had fallen asleep on the dad's chest and had rolled off his chest on to the floor from three to four feet on to a thinly carpeted floor" and that "it had occurred at 4 a.m. the morning before and the dad didn't tell her about it until they were at the hospital." **Doc. 98 at 38.** A few days later, Mr. Wilson told B.H that on Wednesday night—the night before B.W.'s well-child checkup—B.W. was laying on his chest while he was asleep, fell off onto the floor, and that he accidentally stepped on her—without fully putting his weight on her—when picking her up off the floor. **Doc. 102 at 42-46, 55; 103 at 5; gov. exh. 5.**

---

[1] Dr. Beeson also noted that there was "no explanation given for the other bruises" B.W. had on her torso and arms. **Doc. 98 at 35.**

On April 13, 2023, Mr. Wilson was indicted on one count of Child Abuse in Indian Country and one count of Child Neglect in Indian Country. **Doc. 2.** A jury convicted him on both counts on June 5, 2024. **Doc. 95**. He now moves for a new trial under Fed. R. Crim. P. 33. **Doc. 100.**

## DISCUSSION

Fed. R. Crim. P. 33(a) permits a district court to "vacate any judgment and grant a new trial if the interests of justice so requires," including where a conviction is supported with legally sufficient evidence but is nevertheless against the weight of the evidence. *United States v. Fields*, 516 F.3d 923, 949 n.14 (10th Cir. 2008); *United States v. Medeiros*, 2023 8752921, at *5 (10th Cir. Dec. 19, 2023). While the trial court has discretion to weigh the evidence and assess witness testimony, motions for a new trial are disfavored and should only be granted with great caution. *Tibbs v. Florida*, 457 U.S. 31, 37-38 n.11 (1982); *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999); *United States v. Evans*, 42 F.3d 586, 593-94 (10th Cir. 1994) (finding that the power to grant a new trial should be invoked only in exceptional cases where the evidence preponderates heavily against the verdict); *United States v. Garcia*, 182 F.3d 1165, 1170 (10th Cir. 1999) ("A motion for a new trial should be granted if, after weighing the evidence and credibility of the witnesses, the court determined that the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.").

Under Rule 33, the trial court need not view the evidence in the light most favorable to the government but may instead weigh the evidence in a manner that more accurately matches the reality of the proceedings. *Tibbs*, 457 U.S. at 37; *United States v. Thomas*, 2016 WL 9818560, at *8 (D.N.M. Aug. 5, 2016). "A reversal based on the weight of the evidence…draws [the court] into questions of credibility. The "weight of the evidence" refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than another." *Tibbs*, 457 U.S. at 37-38 (internal quotations and citations omitted).

Mr. Wilson moves for a new trial in the interests of justice under Rule 33 on the basis that (1) the weight of the evidence is clearly against the verdict because the Government did not prove each element of every count beyond a reasonable doubt; and (2) the Government failed to comply with Rule 16(a)(1)(G)(iii) by providing him a complete statement of opinions that its expert witness, Dr. Christine Beeson, would provide at trial. **Doc. 100 at 1, 5.** *See* Fed. R. Crim. P. 33; 16(a)(1)(G)(iii). The United States opposes the Defendant's motion. **Doc. 101.**

I. **The weight of the evidence in this trial was in line with the jury's guilty verdict on both counts.**

Mr. Wilson moves for a new trial on the basis that his conviction is contrary to the weight of the evidence presented at trial; specifically, he challenges the jury's finding that (i) he willfully or maliciously injured B.W. and (ii) willfully or maliciously failed to adequately provide medical care to B.W.[2] **Doc. 100 at 2-4.** He further argues that the United States' reliance on circumstantial evidence and the lack of specific evidence on when the injuries occurred undermined the jury's guilty verdict. *Id.* **at 5, 10.**

While the Government must prove each element of a charge beyond a reasonable doubt, the main element contested at trial was whether the Defendant willfully or maliciously injured B.W. and willfully or maliciously failed to provide B.W. with adequate medical care. **Docs. 92 at 6-7; 100 at 2-3; 101 at 2.** The jury was instructed that willful means "purposeful" or "a willingness to commit the act or omission referred to, but does not require intent to violate the law or to acquire any advantage." **Doc. 92 at 6-7.** Malicious "means a wish to vex, annoy or injure another person." *Id.* At trial, the United States presented testimony from five witnesses: (i) B.H., B.W.'s mother; (ii) DHS

---

[2] "There was no medical evidence presented that Defendant was the one that caused the injuries to B.W. Defendant's statements about how B.W. may have received some of the injuries do not rise to the level of willful or malicious acts by Defendant …Without knowing when the injuries occurred, how could any rational juror reach the conclusion that Defendant willfully or maliciously failed to provide adequate medical care when the evidence clearly showed that Defendant did, in fact, provide adequate medical care?" **Doc. 100 at 4.**

4

child welfare specialist, A.S.; (iii) Sergeant Poffel, (iv) FBI Agent Ashley Chavez, and (v) Dr. Christine Beeson. **Doc. 101 at 3.**

The testimony elicited at trial established the following facts. *See generally* **docs. 98; 102; 103.** B.W. was born on February 11, 2022, and was a "healthy, vigorous baby." **Doc. 98 at 28, 32.** For the two months after B.W. was born, her primary caretaker was her mother, B.H. *Id.* **at 33; 102 at 13-14, 23-24.** B.H. returned to work on the morning of April 11, 2022, and Defendant was the baby's primary caregiver while B.H. was at work. **Doc. 102 at 18, 56-58.** After B.H. returned home, she would resume caring for B.W., sleeping with her for part of the night before taking her to Mr. Wilson in another room. *Id.* **at 58-61.** Sometime between April 11, 2022, and April 14, 2022, B.H. noticed a bruise on B.W.'s cheek and a scratch on her arm, injuries she sustained while she was in Mr. Wilson's care. **Doc. 102 at 18, 24-25; gov't exh. 4 at 19:15-20:45.**

Dr. Beeson provided extensive expert testimony about B.W.'s injuries, when she could have sustained those injuries, and the developmental abilities of two-month-olds. *See generally* **doc. 98.** Dr. Beeson testified that she ordered x-rays on April 15, 2022, the day after B.W. was admitted to the hospital**. Doc. 98 at 59-60.** The initial set of x-rays revealed that B.W. had three acute left side rib fractures that occurred sometime in the prior five days. *Id.* **at 60.** Follow-up x-rays taken after two weeks showed that B.W. had healing fractures on her three left ribs, but also on two of her right ribs, her left forearm, right shin bone and calf bones, and left thigh bone and calf bones.[3] *Id.* **at 62-65.** Dr. Beeson testified that healing fractures are at least five-to-seven days old and show evidence of bone

---

[3] Dr. Beeson testified that it is common to initially miss fractures in pediatric patients because, "[Fractures] can be very, very faint and hard to see. It also has to do with is the patient moving, and I can assure you pediatric patients are especially difficult to get good x-rays on because they're wiggly, they're kids.
So for a variety of reasons, that and the way that the x-ray technician completes the x-rays, the kind of beam exposure of the actual radiation and the x-ray machine, all those contribute to whether or not a fracture can show up acutely. That's why we get the repeat x-ray because then we can confidently say if there's a fracture whenever there's signs of healing, they're more obvious than just a crack in the bone. The healing is more obvious because it's a big bump callous formation." **Doc. 98 at 80-81.**

healing through callous formations around the fracture. *Id.* **at 58.** Her opinion was that B.W. sustained all the bone fractures simultaneously because the callous formations and evidence of bone healing appeared to be the same. *Id.* **at 61, 65, 81.** Dr. Beeson also testified that "two-month-old babies don't have the muscle strength to generate enough force to result in a bruise," "normal care and handling of an infant should not result in an injury," "the majority of babies who roll off beds or who are dropped or fall don't have any injuries," and that babies with broken bones are "fussy and inconsolable, crying with routine care and handling." *Id.* **at 25-26.** In fact, B.W. "responded in pain and was crying quite a bit" when Dr. Beeson examined her. **Doc. 98 at 65-66.**

Dr. Beeson also testified to the importance of medical and social histories when diagnosing pediatric patients who arrive at the hospital with injuries, especially when the pediatric patient is too young to tell physicians what happened to them. **Doc. 98 at 18-19.** She explained the medical consequences of a parent's version of events not accurately describing a child's injuries as "delay[ing] the appropriate diagnosis from being made and the appropriate treatment plan from being completed." *Id.* **at 20** ("Q: Do you expect, do you want, do need a parent to tell you what really happened? A: Yes."), **21** ("[W]e rely heavily on the caregivers to give an accurate history so that we can reach the most appropriate diagnosis and treatment plan. When history is changing based on who they're speaking to or what time of day it is or other factors, it clouds the picture and delays the appropriate treatment from being given to the child in a timely manner.")

The Court finds that the weight of the evidence aligns with the jury's conclusion that Mr. Wilson willfully or maliciously injured B.W. *See Garcia*, 182 F.3d at 1170; *Tibbs*, 457 U.S. at 37-38. Mr. Wilson attacks the verdict because there was no medical evidence that connected Mr. Wilson to B.W.'s various injuries, no eyewitness that observed him inflicting any injuries, and no way to determine precisely when B.W. was injured. **Doc. 100 at 4.** While the United States produced little direct evidence on these points, it produced substantial circumstantial evidence from which the jury

6

could reasonably infer Mr. Wilson's guilt. *See id.*; **101 at 5; 92 at 11** (instructing the jury that there is no distinction between direct and circumstantial evidence and that they may make reasonable inferences from the testimony and exhibits that are justified in light of common experience); *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010).

Weighing the evidence requires this Court to make credibility determinations about the witnesses and evidence produced at trial. *See Tibbs*, 457 U.S. at 37-38. While B.H.'s memories of April 14-15, 2022, were at times shaky, she credibly testified that she was not responsible for any of B.W.'s injuries.[4] **Doc. 102 at 12** (describing the love for B.W. as "indescribable" and that B.W. was "precious" to her), **14** ("Q: Did you ever do anything to your newborn baby? A: No, I didn't hurt my baby."), **23-25** ("Q: So you caused the bruise to her? A: No, I didn't cause the bruise to her…. Q: After B.W. had been in the defendant's care, she looks like that. A: Yes."), **51**, **67-72** (describing her brain as "staticky" when describing her memories of April 14, 2024); *Quintanilla*, 193 F.3d at 1146. Further, her testimony was consistent with the testimony of A.S., Sergeant Poffel, Dr. Beeson, and Mr. Wilson's recorded statements that (i) B.W.'s caretakers in the first two months of her life were B.H. and Mr. Wilson; (ii) Mr. Wilson was B.W.'s primary caretaker starting April 11; and (iii) Mr. Wilson was B.W.'s only caretaker from the early morning hours of April 14—when B.H. brought B.W. to Mr. Wilson—through to her well-child checkup later in the day. *See* **docs. 98 at 28-32; 102 at 13-14, 18, 23-24, 56-61; 103 at 28-23, 54-58; gov. exh. 5 at 8:45-9:15.**

Finally, B.H.'s testimony also confirmed that she noticed B.W.'s cheek bruise and a scratch on her arm in the two or three days before April 14, which supports a reasonable inference of escalating abuse over the days that Mr. Wilson was B.W.'s primary caretaker. **Doc. 102 at 19-24, 85**

---

[4] Sgt. Poffel also testified about his impressions of B.H. and Mr. Wilson upon learning about B.W.'s more significant injuries at St. Francis Hospital. He described B.H. as "really emotional," "really distraught," and "really inquisitive about how this would have happened." **Doc. 103 at 30.**

(A.S. testifying that Mr. Wilson told him the bruise had happened a few days before); **98 at 35, 42-43** (Dr. Beeson testified about the cheek bruise: "The significance, knowing how old [B.W.] is, is that it's a two-month-old with a bruise. I know that she is not mobile, so I'm concerned with any abuse on a two-month-old baby. The cheeks are actually a difficult place to bruise because it's real soft and fleshy. There's not a lot of, like, bony structure under it, so it takes quite a bit more force to bruise the cheeks, and we don't typically see cheek bruising on children.");[5] **gov't exh. 4 at 19:15-20:45**. *See Nevils*, 598 F.3d at 1167; *Evans*, 42 F.3d at 593-94.

The Court finds Dr. Beeson's expert testimony—given her education, background, training, and personal observations of B.W.—highly credible. *See Garcia*, 182 F.3d 1165, 1170; *Tibbs*, 457 U.S. at 37-38. Based on her testimony, the weight of the evidence establishes that B.W. was not at a developmental stage where she could injure herself. **Doc. 98 at 22-25** ("[Two-month-old babies] are not mobile. So they're not able to generate enough force to injure themselves;" "Babies start kind of rolling over around four months old. So a two-month-old kind of just lays there;" "I expect to see no injuries on a two-month-old baby."). Additionally, Dr. Beeson's testimony credibly established that B.W.'s bruises, eye injury, and fractures were not consistent with Mr. Wilson's explanations[6] and were more consistent with mechanisms of child abuse—including direct blows, squeezing, and forceful yanks and tugs. *Id.* **at 44-5** ("Q: Are you able to tell us from the location [of the bruise] on

---

[5] *See also* **doc. 98 at 66** ("Q: In your training and experience, if a two-month-old baby has the bruising we saw on B.W.'s cheek, that in and of itself is she in need of medical attention? A. Yes. Q: But you're a very highly trained, skilled pediatrician who is board certified in two areas. What if it's just a parent who doesn't have any fancy degrees? Do you expect that parent to provide medical attention for their baby in that condition?" … A: I would expect a parent to seek medical care."); **68-69** ("In a circumstance where a caregiver causes injuries to a baby, including bruises or broken bones, and then does not provide immediate medical care for that baby do you have a medical diagnosis for that delay in medical care? A: Yes. … Q: What is your medical diagnosis? A. Child neglect.").

[6] Dr. Beeson testified, "Q: Do you have an opinion as to whether any of B.W.'s injuries, the constellation of B.W.'s injuries are consistent with her, first of all, rolling off a bed? … A. It is not consistent with rolling off of a bed…Q: Do you have an opinion as to whether or not the constellation of B.W.'s injuries are consistent with her rolling off an adult off of the bed? … A: It is inconsistent with her rolling off of an adult off of a bed… Q: Do you have an opinion as to whether or not the constellation of B.W's injuries are consistent with her laying on her tummy on the floor and an adult stepping on her butt not putting full weight on her? A: It is not consistent with that history." **Doc. 98 at 70.**

her cheek and temple whether these bruises are the result or consistent with one blow or more than one blow? A: They're consistent with more than one blow. Q: Why? A: They're on different planes of the body…Because it would be impossible to get an injury on numerous planes of the body without numerous strikes or blows or points of contact."), **51** ("A subconjunctival hemorrhage is known as a sentinel injury. Meaning it's an injury that is visible to caregivers, but that is concerning for something happening to the baby. Subconjunctival hemorrhages don't just pop up. They're a result of usually a direct mechanism."), **62** (testifying that B.W.'s transverse fracture was most consistent with a direct blow with an excessive amount of force), **63-66** (describing the fractures on B.W.'s legs as metaphyseal or corner fractures, consistent with forceful pulling or yanking). While it is true that there is no way to determine exactly when B.W. was injured, her fractures were acute—meaning (i) she had been injured in the few days before the x-rays were taken on April 14, 2022, (ii) she was injured during the time that Mr. Wilson was B.W.'s primary caretaker, and (iii) the fractures were sustained at the same time. *Id.* **at 59-61.**

The jury also heard credible testimony from Sergeant Poffel and A.S. about how child abuse investigators view a caretaker's changing explanations for how a child obtained an injury. *See* **docs. 102 at 87** ("Q: If a parent's explanation of what caused a baby's injury changes over time, is that concerning to you? A: Yes. Q: Why is that concerning to you? A: We just have an inconsistency with how that injury was formed."), **93** ("If you ask someone to demonstrate how an injury occurred, and it doesn't match the side of the injury, that might indicate they have done something wrong, right? … A: Yes."); **103 at 25-26** ("Q: When you're investigating a child abuse case is it concerning to you if the suspect gives different explanations for injuries to different people?" … A: If the story is changing from different person to different person, it's a red flag for us. It's an indicator. So if an injury happened the way it's said to have happened, then that story should stay relatively consistent from each person that person tells." … "Q: Is it concerning to you if a suspect changes his explanation as

9

he received additional information about the extent of the child's injury? A: Yes. Q: Why is that concerning to you? A: Generally, we would hope when we ask about the injuries, we get the upfront honest answer."); *Garcia*, 182 F.3d 1165, 1170; *Tibbs*, 457 U.S. at 37-38.

Mr. Wilson argues that there is "substantial evidence presented that Defendant is a peaceful person," which is inconsistent with him willfully or maliciously harming B.W. and should give rise to reasonable doubt. **Docs. 92 at 15** (instructing the jury that evidence of good character "may be sufficient to raise reasonable doubt"); **100 at 4** (describing testimony elicited from Mr. Wilson's character witness—his uncle B.T.—that Mr. Wilson was a peaceful person, that he could trust Mr. Wilson with his grandkids, and that he had never known Mr. Wilson to be violent); **102 at 68** (B.H. testifying briefly that Mr. Wilson had never struck her, never been abusive towards her), **72** (B.H. testifying that she previously told Mr. Wilson's defense counsel that the Defendant was a great dad, a patient person, and had never yelled or gotten upset at her).

Mr. Wilson overstates the weight of his character evidence. *See Garcia*, 182 F.3d at 1170. While relevant, the brief testimony at trial about Mr. Wilson's peaceful character does not create reasonable doubt that outweighs the government's substantial evidence that (i) B.W. was injured while in Mr. Wilson's care, (ii) her injuries were not accidental[7] or the result of B.W. injuring herself, (iii) B.W.'s injuries were consistent with direct blows, squeezing, and forceful yanks, supporting a diagnosis of child physical abuse,[8] and (iv) B.W.'s injuries were not consistent with Mr. Wilson's shifting explanations and implausible trauma history for B.W. *See* **docs. 98 at 22-25, 58-66; 102 at**

---

[7] Dr. Beeson testified that there was no medical cause, medical explanation, mimics, or conditions (like brittle bone disease or rickets) that explained B.W.'s injuries. **Doc. 98 at 37.**

[8] *See also* **doc. 98 at 69** (Dr. Beeson testifying, "Q: But asking you separately, first of all, if B.W. only had the bruising to her body and you did not have plausible trauma history, what would your diagnosis be? A. Child physical abuse. Q: If B.W. only had the busted blood vessel in her eye and you did not have a plausible trauma history, what would her diagnosis be? A: Suspected child abuse. Q: If B.W. only had one broken bone and did not have a plausible trauma history, what would your diagnosis be? A: Child physical abuse.").

10

**14, 18-24, 87; 103 at 25-26; gov't exh. 4 at 19:15-20:45;** *Evans*, 42 F.3d at 593-94; *Tibbs*, 457 U.S. at 37-38.

At a minimum, the Government produced enough evidence for the jury to determine that Mr. Wilson intentionally hit, squeezed, or yanked B.W., even if he did not intend to physically abuse her or give her the injuries that she sustained. **Doc. 92 at 6; 99 at 14** ("No one here has tried to convince you that he wanted to hurt B.W. or that he wanted to break her bones. He probably just wanted her to stop crying, to be quiet, to let him go back to whatever it was he was wanting to do."); *Quintanilla*, 193 F.3d at 1146. Without no plausible non-abusive trauma history provided by Mr. Wilson, the jury's verdict that Mr. Wilson willfully or maliciously harmed B.W. is, therefore, not contrary to the weight of the evidence. ***See*** **doc. 98 at 25-26, 68-71***;* **gov. exh. 5 at 8:45-9:15;** *Garcia*, 182 F.3d at 1170; *Tibbs*, 457 U.S. at 37-38. A new trial is not justified in the interests of justice for his guilty verdict on Child Abuse in Indian Country. ***See*** **doc. 95**; Fed. R. Crim. P. 33; *Fields*, 516 F.3d at 949 n.14.

The weight of the evidence presented at trial also supports a guilty verdict on the second count, Child Neglect in Indian Country. ***See*** **doc. 95**, *Evans*, 42 F.3d at 593-94; *Tibbs*, 457 U.S. at 37-38. Mr. Wilson argues that he did provide adequate medical care to B.W. by taking her to her pre-scheduled well-child checkup. **Doc. 100 at 4.** However, the Government provided significant evidence that, viewed in the light of common experience, suggests that Mr. Wilson did not provide adequate medical care to his daughter as her primary caretaker. ***See*** **doc. 92 at 11**; *Quintanilla*, 193 F.3d at 1146. First, the Government established that B.W. needed immediate medical care from the time she sustained the bruises on her body, at least one of which—the cheek bruise—occurred sometime between April 12-14. ***See*** **doc. 98 at 35, 65, 68-69.** Second, even giving credence to Mr. Wilson's shifting trauma history for B.W., the Government has provided evidence that B.W. was

"inconsolable" and "crying quite a bit," from her ten broken bones.[9] **Docs. 98 at 65; 102 at 72**. Given the extent of her injuries, weight of the evidence supports a commonsense inference that (i) B.W. was at least uncharacteristically fussy while Mr. Wilson was her primary caregiver; (ii) Mr. Wilson should have at least known that something was medically wrong with B.W. because he was the cause of those injuries; and (iii) Mr. Wilson purposefully waited to provide that care to her until her well-child checkup. *See* **docs. 92 at 11; 98 at 26-27, 67; 102 at 13-14, 18, 23-24; gov. exh. 5 at 8:45-9:15.**

Finally, the Government produced substantial evidence highlighting the importance of an accurate trauma history to physicians providing care to a child that has suffered abuse and neglect. *See, e.g.*, **docs. 98 at 18-20, 65-69 71-74; 103 at 25-26.** Even if Mr. Wilson was unaware that B.W. needed medical care before taking her to her pediatrician's office, he impeded her medical care by failing to tell B.W.'s physicians precisely what happened to her.[10] Mr. Wilson flatly denied that he had ever dropped B.W. to Sgt. Poffel, and only disclosed to B.H., not any of B.W.'s medical providers, that he stepped on B.W. days after B.W. was admitted to St. Francis Hospital. *See* **gov't exh. 4 at 19:15-20:45, 26:25**; **gov't exh. 5 at 4:10-5:10, 38:25-55**; **doc. 98 at 38.** His four evolving explanations—B.W. throwing her head back and hitting her head on his shoulder, B.W. falling face-

---

[9] Dr. Beeson testifying that a baby's bones are not harder or easier to break than an adult's and experiences the same levels of pain that an adult would. **Doc. 98 at 26-27** ("Q: If a baby has a broken bone, as a board-certified pediatrician and with all your training and experience, what would you expect for the signs and symptoms of that baby once that baby has a broken bone? A: If the baby had a broken bone, I would expect them to be very fussy and inconsolable, crying with routine care and handling. Like, if you pick up the baby, I would expect normal care actions to be more painful."). *See also id.* at 67 ("Q: What about if a baby has a broken bone? Without x-rays, do you expect a parent to know that the bone is broken? A: Not necessarily. Q: Do you expect the parent to know something is wrong with that baby? A: I would expect that, yes…Q: If a parent does not provide medical treatment for a baby who has broken bones, is there a diagnosis for that? … A: Medical neglect. Q: If a person is a perpetrator and who committed whatever act caused the broken bones and the injuries and then does not provide medical care, is there a medical diagnosis for that? … A: Child neglect.").

[10] *See* **gov't exh. 4 at 19:15-20:45** (Mr. Wilson stating that he told Dr. Stratton the truth about what happened to B.W.'s face); **26:25** (Sgt. Poffel asking Mr. Wilson at his interview in the hospital "Have you guys ever accidentally dropped her or anything like that?" and Mr. Wilson answering, " Oh no, no, no, never."); **gov't exh. 5 at 4:10-5:10** (Mr. Wilson admitting in his FBI interview for the first time that he stepped on B.W.), **22:30-23:31** (Mr. Wilson admitting that he knew B.W. sustained the fractures from falling on the floor and stepping on her, but did not immediately tell Sgt. Poffel or her physicians); **38:25-55** (admitting that the first time he told B.H. that he stepped on B.W. was days after B.W. was admitted to the hospital).

first into his collar bone, B.W. falling off the bed, and him accidentally stepping on B.W.—delayed an appropriate diagnosis and adequate medical care for B.W. *See* **doc. 98 at 66**, **68-69; Doc. 102 at 42-46, 55; 103 at 5.** Mr. Wilson's failure to disclose his version of B.W.'s trauma history in a timely manner was certainly willful and purposeful, if not malicious. *See* **docs. 92 at 6-7, gov't exh. at 22:30-23:31**. Despite the Defendant's assertions, the substantial weight of the evidence suggests that he, despite knowing the cause of her injuries, did not provide B.W. with adequate medical care. *See* **docs. 92 at 6-7; 100 at 2-4**; *Garcia*, 182 F.3d at 1170; *Tibbs*, 457 U.S. at 37-38. The interests of justice do not require a new trial. *See* Fed. R. Crim. P. 33; *Fields*, 516 F.3d at 949 n.14.

## II.     There was no violation of Rule 16, so the interests of justice do not require a new trial.

Rule 16(a)(1)(G)(iii) requires the government to provide an expert witness disclosure that contains a complete statement of all opinions that the government will elicit from the witness in its case-in-chief, the bases and reasons for them, the witness's qualifications, and a list of other cases that the witness has testified at as an expert over the previous four years. Fed. R. Crim. P. 16(a)(1)(G)(iii). The summary of expected testimony is intended "to permit more complete pretrial preparation," such as lining up an opposing expert, preparing for cross-examination, or challenging the admissibility of the expert opinion. Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment; *United States v. Nacchio*, 519 F.3d 1140, 1151 (10th Cir. 2008), *vacated in part on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009). Expert witness disclosures require "a complete statement of all opinions the expert will provide but does not require a verbatim recitation of the testimony the expert will give at trial." Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment.

Before trial, the United States submitted a Notice of Intent to Offer Expert Testimony by Dr. Christine Beeson. **Doc. 33.** Mr. Wilson challenged the sufficiency of the notice[11] was granted a *Daubert* hearing. **Doc. 36 at 2-3; 55.** At the *Daubert* hearing, Defendant's challenge was focused on Dr. Beeson's testimony as to quantifying the expected level of pain suffered by the victim. **Doc. 55.** The Government submitted a Supplemental Notice of Intent to Offer Expert Testimony after the Daubert hearing, summarizing the opinions it expected to elicit from Dr. Beeson. **Doc. 65.**

> 1. Dr. Beeson will testify to all aspects of her knowledge, training, and experience in the area of child physical abuse and neglect and child abuse and neglect examinations, in particular:
>    a.   Her education, background, training, and experience;
>    b.   Her knowledge and experience in the area of child physical abuse and neglect;
>    c.   Her knowledge of all aspects of human anatomy, **the mechanism of injuries in child physical abuse, and the injuries sustained as a result of child physical abuse**; and
>    d.   Her knowledge regarding the importance of history, her experience in obtaining history from parents and/or potential perpetrators, and all factors used to determine between accidental or non-abusive trauma and abusive trauma.
>
> 2. Dr. Beeson will testify regarding her involvement in this case, in particular:
>    a.   Her observation and examination of the victim in this case;
>    b.   Her review of the records, reports, photographs, medical records, medical history, etc., regarding the victim;
>    c.   **Her knowledge regarding the victim's injuries**, including expected levels of pain sustained by the victim; and
>    d.   Her medical diagnosis of child physical abuse.

**Docs. 33 at 1-2; 65 at 1-2 (emphasis added).** The Court also granted the Defendant an opportunity to file further objections as to the sufficiency of the Government's supplemental expert

---

[11] "The Defendant does challenge the Notice of Intent on the basis that it has not provided a complete statement of all opinions, nor does it provide the bases for all of the opinions that are provided, specifically the bases for expected pain levels. Referring to the Notice of Intent, it does not appear that the Government has included a complete statement of all opinions of which Dr. Beeson will be testifying. The Government adequately provides that Dr. Beeson will testify about her training, education and experience and her involvement in this particular case, however, the only opinions that are provided in the Notice of Intent appear to be that Dr. Beeson will provide an expert opinion as to her medical diagnosis and an expert opinion as to the expected levels of pain sustained by the victim." **Doc. 36 at 2.**

notice. **Doc. 66.** But he did not do so. **Doc. 68 at 2.** Rather, his supplemental objection focused on his *Daubert* challenge that "Dr. Beeson's testimony as to the expected levels of pain sustained by the victim is not scientifically reliable." **Doc. 67 at 1**. Because he did not file any objection to the supplemental notice, this Court accepted the sufficiency of the supplemental notice **Doc. 68 at 2**.

At trial, Dr. Beeson provided her expert opinion on the injuries sustained by B.W. and the mechanisms of abuse that were most consistent with those injuries. ***See generally* doc. 98 at 45-70.** For example, she testified that subconjunctival hemorrhage like the one in B.W.'s left eye is usually the result of a direct blow mechanism and that the bruising on her arm and torso were consistent with a squeeze-type injury or a direct blow. **Doc. 98 at 46-47, 50-51, 54.** She also testified that B.W. suffered a (1) transverse fracture to her left forearm, an injury consistent with a direct blow, and (2) metaphyseal fractures to her right shin bone, right calf bone, left thigh bone, and left calf bone, all consistent with a "forceful pull or yank-type mechanism." *Id.* **at 62-65.** Mr. Wilson argues that he had no way of knowing that Dr. Beeson was going to testify about the specific modalities of how B.W. received her injuries because the Government's notice only suggested that "Dr. Beeson would be testifying that B.W.'s injuries were non-accidental and inconsistent with Defendant's story about how B.W. received the injuries." **Doc. 100 at 7.** The Court disagrees.

The United States provided a complete statement of opinions that Dr. Beeson testified to. ***See* docs. 33; 65;** Fed. R. Crim. P. 16(a)(1)(G)(iii). Her testimony was based on her personal observation and examination of B.W., medical records detailing the injuries B.W. sustained (e.g., transverse fractures, metaphyseal fractures, subconjunctival hemorrhage), the causes most consistent with those injuries, the plausibility of Mr. Wilson's trauma history, and B.W.'s medical diagnosis of child physical abuse and child neglect. *See* **doc. 101 at 7; 100 at 6** (Defendant concedes that the Government provided specific notice of Dr. Beeson's testimony that the fracture on B.W.'s forearm was consistent with a direct blow because Bates 410 of discovery states that a "direct blow to the

forearm is the most common cause of an ulnar fracture"). These documents, produced in discovery, provided enough notice to Mr. Wilson that Dr. Beeson's testimony would include her opinion that B.W.'s injuries were inconsistent with the Defendant's explanations *and* the child abuse mechanisms most consistent with B.W.'s injuries. *See Nacchio*, 519 F.3d at 1151.

Dr. Beeson described the types of fractures sustained by B.W. and provided her opinion on the timeframe in which those injuries occurred. ***See* doc. 98 at 46-47, 50-51, 54, 62-65.** For each fracture, Dr. Beeson then offered her opinion—as a physician board certified in pediatrics and child abuse and neglect—about the specific mechanisms of injury in child abuse that B.W.'s injuries are consistent with. ***See id.***; *United States v. McGee*, 2024 WL 217848, at *9 (E.D. Okla. Jan. 19, 2024) (finding an expert notice sufficient where the notice specifies the topic on which the expert will testify, which were based on her education, background, training, and experience). Nowhere in her testimony did Dr. Beeson opine about the definitive cause of B.W.'s injuries; instead, she testified that B.W.'s injuries were consistent with specific mechanisms of child abuse—forceful pulling, squeezing, and direct blows—all of which supported a medical diagnosis of child physical abuse. **Doc. 98 46-47, 50-51, 54, 62-65.** At trial, the Defendant did not object to Dr. Beeson's testimony about the most likely causes of B.W.'s injuries, nor did he cross-examine Dr. Beeson about her opinions about the specific child abuse mechanisms most consistent with B.W.'s injuries. **Doc. 98 at 4-7; 62-65, 71-88.**

Dr. Beeson's testimony was consistent with the Government's expert notice: she testified about her knowledge of B.W.'s injuries, the probable mechanisms that created those injuries, and whether these injuries are consistent with child physical abuse. ***See* docs. 33 at 1-2; 65 at 1-2.** The medical records produced in discovery and the language in the Government's expert notice provided sufficient—albeit not verbatim—notice to allow Defendant to prepare for cross-examination or procure his own expert witness. *See* **docs. 33; 65**; Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment; *Nacchio*, 519 F.3d at 1151. Therefore, the United States' expert notice did not

prejudice Mr. Wilson in his trial preparations, so the interests of justice do not warrant a new trial. *See* Fed. R. Crim. P. 33; *Garcia*, 182 F.3d at 1170.

## CONCLUSION

For the reasons above, the Defendant's Motion for a New Trial (**Doc. 100**) is **DENIED.**

**IT IS SO ORDERED.**

_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE